IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| AMANDA FENNEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:23-CV-530-RAH |
| ) | |
| ELMORE COUNTY BOARD OF ) EDUCATION, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Amanda Fennel, a white female, brings this employment discrimination action against her former employer, the Elmore County Board of Education (the Board). Fennel alleges she was unlawfully discriminated against on account of her sex and race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* when the Board terminated her probationary employment. Discovery now at an end, the Board has moved for summary judgment. With the Board's motion having been fully briefed and thus ripe for decision, for the reasons more fully set forth below, the motion is due to be granted.

## II. JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

1

matter of law" based on the materials in the record. Fed. R. Civ. P. 56(a), (c). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. Of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Applicable substantive law identifies those facts that are material. *Id.* An issue is not genuine if it is unsupported by evidence or created by evidence that is "merely colorable, or is not significantly probative." *Id.* at 249 (citations omitted). The movant can satisfy its burden of proving the absence of a genuine dispute by citing to materials in the record or by showing that the nonmovant cannot produce evidence to establish an element essential to their case to which it has the burden of proof. Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 322–23.

If the movant meets its burden, the burden shifts to the nonmoving party to establish "specific facts showing that there is a genuine issue for trial" with evidence beyond the pleadings. *Celotex Corp.*, 477 U.S. at 324. Generally, a "mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## IV. FACTUAL BACKGROUND

In July 2021, the Board hired Fennel, a white female, as an assistant principal at Wetumpka High School. (Doc. 56-1 at 3.) She was to serve as a probationary employee during her first three years there. (*Id.* at 42–43.) She was one of three assistant principals at Wetumpka High School, along with Rahman Bell—a black male—and Benetta Eutsey—a black female. (*Id.* at 6–7.) Fennel's primary responsibility was eleventh- and twelfth-grade student discipline while Bell and Eutsey had primary responsibility for ninth- and tenth-grade student discipline, respectively. (*Id.* at 11–13.)

Fennel and Bell were terminated in May 2022 after an investigation by Principal Robbie Slater and Human Resources Director Susanne Goodin concluded that they had engaged in intimate and inappropriate behavior on school grounds during school hours. (Doc. 49-17 at 2; Doc. 56-16 at 3–4.) The following are the pertinent facts that preceded the terminations, viewed in a light favorable to Fennel.

### A. September 2021 Incident

In September 2021, Kaitlyn Shumate—a teacher at Wetumpka High School—entered the teacher's lounge and observed Fennel and Bell alone in close proximity to each other. (Doc. 49-13 at 2.) According to Shumate, when Fennel and Bell noticed Shumate had entered the teacher's lounge, they quickly jumped away from each other and straightened their clothes. (*Id.*) Shumate reported the incident to Slater, stating that she felt extremely uncomfortable and that Fennel looked embarrassed. (*Id.*; Doc. 49-3 at 3–4.)

Slater reported the incident to Goodin. (Doc. 49-5 at 12–13.) Slater also met with Bell about the incident in September 2021 and instructed him to limit his interactions with colleagues behind closed doors and to limit his interactions to those necessary to complete his job responsibilities. (Doc. 49-19 at 2–3.) In response, Bell explained to Slater, "[Fennel and I are] both assistant principals, so there are going

3

to be times that we are going to work closely with each other." (Doc. 56-4 at 30.) Slater claims to have also met with Fennel about the incident, but Fennel denies that she discussed the incident with Slater. (Doc. 56-1 at 46–47.)

**B.     March 2022 Incident**

On March 8, 2022, Fennel and Bell were again seen alone in close proximity behind closed doors. On that occasion, Laura Dennis—a teacher—opened the door to Bell's office to alert him to a student fight in her hallway. (Doc. 49-7 at 9.)

As soon as she came in, Bell, startled by her entrance, yelled: "Oh shit." (Doc. 49-8 at 2; Doc. 49-19 at 3.) Dennis observed Fennel leaning against a desk, with Bell standing against her and touching her. (Doc. 49-7 at 5–7.) According to Dennis, she yelled, "There is a fight, we need help." (*Id.* at 9.) She then left the office, followed by Bell.

Dennis heard Bell pulling up his zipper as he followed behind her. (*Id.* at 10–12.) Surveillance video shows Bell zipping up his pants as he ran out of his office to follow Dennis. (Doc. 49-2 at 2–3.) Dennis recounted that she was shaking upon returning to her classroom because of what she had seen in Bell's office. (Doc. 49-7 at 22–23.)

For her part, Fennel has a different take on what happened. According to Fennel, that morning, the technology coordinator contacted her and requested that she provide Bell with instructions on how to reboot his phone, which had been out of commission for several days. (Doc. 56-1 at 13–17.) Fennel then went into Bell's office to show him how to reboot his phone and to retrieve her coffee cup and walkie-talkie that she had left there earlier that morning. (*Id.* at 13–15.) The door was closed behind her while she was in Bell's office.

Then, while waiting for the phone to reboot and discussing work-related matters, Bell stood up to get a drink, and Fennel noticed that the zipper on Bell's pants was down. (*Id.* at 24–25.) Fennel told Bell about his zipper, and he responded

4

that it was broken. (*Id.* at 26.) Fennel replied that she had safety pins in her office and pointed to where Bell needed to place the safety pin to secure his zipper. (*Id.* at 26–29.) During this interaction, Bell was standing with his back to the door and Fennel was standing facing the door and him. (*Id.* at 25–26.)

Then suddenly, Dennis opened the door to Bell's office, entered, and asked for Bell's assistance with a student fight. (*Id.* at 30–32.) According to Fennel, Dennis specifically asked for Bell by name because the fight was in the ninth-grade hallway, which was within Bell's supervisory responsibility. (*Id.* at 34–35.) Dennis then left the office and was followed by Bell.

Fennel remained in Bell's office for an additional minute and a half after Bell and Dennis left. (Doc. 49-1 at 55.) According to Fennel, she stayed behind because she was gathering her coffee, walkie talkie, and the administrative referrals she had been discussing with Bell and was waiting for Bell's phone to finish rebooting. (Doc. 56-1 at 33–34.) She then proceeded to the student fight, arriving the same time as Eutsey. (*Id.* at 37–38.)

Afterward, Bell reported the Dennis-encounter to Slater. (Doc. 49-11 at 12.) He told Slater that he had been alone with Fennel in his office, talking about his broken zipper when Dennis walked in. (*Id.*) Bell denied any wrongdoing, but admitted that it probably "wasn't a good decision" to be behind closed doors with Fennel given his past directive from Slater. (*Id.* at 12–13.) Slater also spoke with Dennis the same day to hear her version of the events. (Doc. 56-4 at 4.)

**C.   Fennel's Termination**

The day after the incident, Fennel and Bell were placed on administrative leave pending an investigation. (Doc. 49-15 at 2; Doc. 49-18 at 2.) The Board later initiated an investigation led by Goodin.

During the investigation, Goodin reviewed the video footage outside of Bell's office from the day of the incident as well as a random sampling of other dates. (Doc.

49-11 at 26.) She noticed that there were "extended periods of time" that Fennel and Bell were behind closed doors during school hours without teachers or students present. (*Id.*; Doc. 49-21 at 5-6.)

Both Fennel and Bell submitted written statements to Slater and Goodin, acknowledging that they had been in Bell's office alone behind a closed door, but denied anything inappropriate or unprofessional. Instead, they claimed that they were simply discussing a student discipline matter and Bell's broken zipper. (Doc. 49-9 at 2; Doc. 49-10 at 2-3.)

Fennel got a chance to further explain the incident in a meeting with Slater and Goodin, but at the meeting, other than denying that anything unprofessional had occurred, she simply read aloud the same written statement that she had previously submitted. (Doc. 49-1 at 26–27.) She also told them that she did not remember why she remained in Bell's office after he left to attend to the fight.[1] (*Id.*)

Following her investigation, Goodin concluded that Fennel and Bell had engaged in inappropriate conduct "unbecoming of a school administrator." (Doc. 49-5 at 16, 27.)

In April, after reviewing Goodin's findings, Superintendent Richard Dennis notified Fennel and Bell that he was recommending their termination to the Board. (Doc. 49-4 at 4–7; Doc. 49-16 at 2; Doc. 49-19 at 2–4.) According to Superintendent Dennis, he believed that Fennel and Bell compromised themselves as leaders in the eyes of the faculty and staff, that they had engaged in inappropriate, intimate behavior on school grounds during school hours, and that Fennel had failed to timely respond to the fight. (Doc. 49-4 at 5–9.) Specific to Bell, Dennis considered both instances of inappropriate behavior with Fennel as well as unwelcome comments

---

[1] In her deposition, Fennel testified that she remained in Bell's office in order to collect her coffee, walkie talkie, and a sticky note, as well as to ensure that Bell's phone finished rebooting. (Doc. 49-1 at 23.)

Bell had made to female colleagues that he had previously been warned about. (*Id.*) In his thirty-five years of experience, Dennis "never dealt with [a situation] quite like that." (*Id.* at 6.)

Ultimately, the Board voted to terminate Fennel and Bell. (Doc. 49-11 at 42; Doc. 49-17 at 2.) The Board reasoned that Fennel and Bell "were engaged in intimate, inappropriate behavior on school grounds during school hours." (Doc. 56-16 at 3.) The Board credited Laura Dennis's observation that Fennel and Bell were standing close to each other "in an apparent intimate manner." (*Id.* at 4.)

Fennel subsequently brought this suit against the Board, alleging that its decision to terminate her employment was because of her sex and her association with a black male in violation of Title VII. (Doc. 1 at 1.) Bell did not file suit.

## V.     DISCUSSION

Fennel raises two claims of unlawful discrimination under Title VII. First, she alleges the Board terminated her employment because of her sex. Second, Fennel brings an associational race claim, alleging that the Board's decision was motivated by her association with Bell—a black male. Fennel proceeds under a mixed-motive theory of causation for both claims, arguing that the Board's decision was at least in part motivated by her sex and race, even if the Board had other motivations. In its summary judgment motion, the Board primarily argues that Fennel does not present sufficient evidence of sex and race discrimination in the context of her termination.

### A.     Sex Discrimination Claim

Title VII makes unlawful an employer's decision to discharge an employee "because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII discrimination claims require proof of discriminatory intent. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000). "Title VII offers plaintiffs two theories of discrimination: single-motive and mixed-motive." *McCreight v. AuburnBank*, 117 F.4th 1322, 1330 (11th Cir. 2024). Under a single-

motive theory, "a plaintiff 'must prove that the true reason for an adverse action was illegal' bias." *Id.* at 1330–31 (cleaned up) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235, 1237 (11th Cir. 2016)). On the other hand, under a mixed-motive theory, the plaintiff need only prove that an illegal reason was *a* motivating factor in the decision—not that it played a "dispositive role." *Id.* at 1331. In other words, "the employee contends that both legal and illegal reasons motivated her firing." *Id.*; 42 U.S.C. § 2000e-2(m).

Fennel proceeds under a mixed-motive theory of discrimination with circumstantial evidence. "To avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was a motivating factor for the [employer]'s adverse employment action." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (internal quotation marks omitted) (quoting *Quigg*, 814 F.3d at 1239). Because she proceeds under a mixed-motive theory, Fennel is not required to satisfy the *McDonnell Douglas* burden-shifting framework. *See Quigg*, 814 F.3d at 1237–38 ("In light of this clear incongruity between the *McDonnell Douglas* framework and mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment.").

Although mixed-motive theories of discrimination allow a "lessened standard of causation," the standard of proof is not lessened. *McCreight*, 117 F.4th at 1333. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents sufficient evidence that would allow a reasonable jury to infer intentional discrimination by the decisionmaker. *See id.* No matter which theory the plaintiff relies on, "[b]its and pieces of evidence" are insufficient to survive summary judgment. *Id.*

To begin, Fennel's termination was obviously an adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (adverse employment actions include "ultimate employment decisions . . . such as termination, failure to hire, or demotion"). Thus, the only dispute is whether sex was a motivating factor.

In its summary judgment motion, the Board argues that Fennel lacks any, let alone insufficient, evidence suggesting that the Board was motivated by her sex. Instead, it submits that her termination was because of (1) Laura Dennis' observation that Fennel was "standing so intimately close to Bell while in his office during school hours that [she] became emotionally distraught" and (2) Fennel's failure "to respond appropriately to a student fight." (Doc. 58 at 2–3.) The Board also argues that Fennel's purported comparators are not "similarly situated in all material respects," so no reasonable jury could infer discriminatory intent. (Doc. 48 at 22.) In the Board's view, none of the comparators were "accused of being in a compromising position on campus during school hours or failing to respond to a student emergency." (Doc. 58 at 12.) Finally, the Board notes that both Fennel, a female, and Bell, a male, were treated exactly the same as a result of the March 8, 2022 incident; that is, they were terminated.

Fennel argues that at least five categories of circumstantial evidence would allow a reasonable jury to infer intentional sex discrimination. She points to (1) "decisionmakers' focus on [her] gender in her 'compromised position' of being behind closed doors with a male administrator," (2) "comparator evidence regarding Defendant's more favorable prior treatment of Bell," (3) "evidence of other male comparators accused of inappropriate conduct who also received more lenient treatment," (4) "non-comparator evidence of Defendant's tolerance of sexual harassment," and (5) "evidence of pretext in Slater's fabrication of a memo to make it appear that [Fennel], like Bell, had previously been warned." (Doc. 55 at 23–24.)

This circumstantial evidence identified by Fennel—taken separately or together—is insufficient to create a genuine issue of material fact as to whether Fennel's termination was motivated by her sex. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1343 (11th Cir. 2023).

As to the first category of circumstantial evidence, Fennel argues that sex discrimination can be inferred from the Board's concern "about a male and a female administrator spending time together alone behind closed doors." (Doc. 55 at 24.) She points to a Board member's question during Bell's termination hearing asking Slater, "Can you explain when it would be appropriate for two administrators to be together behind closed doors, a male and a female?" (*Id.* at 25; Doc. 56-4 at 15.) According to Fennel, there was no evidence that she and Bell were touching; rather, they were merely standing in "close proximity" alone in Bell's office. (Doc. 55 at 24.) So, as she states it, the Board's conclusion that she engaged in inappropriate behavior was based on her sex: "if she were a man, Slater would not have escalated the issue to the central office and [the Board] would not have terminated her employment." (*Id.* at 25–26.)

Viewing this evidence in a light favorable to Fennel, the evidence is insufficient to show that Fennel's sex was a motivating factor in the Board's decision to terminate her. Rather, the evidence shows that the Board's decision was motivated by Laura Dennis' observations and Superintendent Dennis' recommendation that Fennel and Bell should be terminated for their conduct at school. As Fennel does not contest, Laura Dennis observed—and the Board found credible—that Fennel and Bell were standing "in close proximity" to each other behind a closed door, that Bell yelled, "Oh Shit," as Dennis entered the office, and that Dennis heard Bell's zipper as they ran into the hallway. Video footage also showed Bell running into the hallway, adjusting his zipper, with Fennel staying behind in his office for another minute and a half. Moreover, security camera footage revealed that Bell and Fennel

spent a lot of time alone behind closed doors without explanation. That observation by another teacher and the video footage was supplemented by Fennel's later assertion that she was pointing to and discussing Bell's open zipper when Dennis entered the office, thereby giving credibility to Laura Dennis's observation and report about what she had seen.[2]

Fennel does not argue that these facts could not support a reasonable, common-sense inference or belief by Laura Dennis, Goodin, Superintendent Dennis, or the Board that something inappropriate had occurred within Bell's office between Fennel and Bell. Common sense easily supports such a conclusion, even if Fennel is correct in that nothing unprofessional actually occurred. As has long been recognized, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Moreover, one Board member's question as to when it would be appropriate for a male and female to be alone behind closed doors does not create a genuine issue of material fact here. The Supreme Court has emphasized that "common sense" and "appropriate sensitivity to social context" are important in Title VII cases. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). Title VII does not reach "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Id.* at 81. At most, the Board member's reference to the parties' sex, after Superintendent Dennis had already recommended Fennel's termination, is a "stray remark" largely unconnected to the decision-making process. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Breeding v. Integrated Behav. Health Inc.*, No. 22-10374, 2023 WL

---

[2] Needless to say, Bell's open zipper behind closed doors creates its own sexual inferences.

11

3735341, at *5 (11th Cir. May 31, 2023) (per curiam). It reflects a genuine inference based on an admitted fact—that male and female administrators were observed behind a closed door in a suggestive position. Without more, the rhetorical question by a single Board member after Superintendent Dennis had already recommended termination does not suggest that sex as a female was an impermissible motivating factor in Fennel's termination, especially when a male was also terminated as a result of the same incident.

Next, Fennel proffers several examples of male comparators who she claims were subject to more favorable treatment when accused of similar misconduct. But none of Fennel's comparator evidence suggests that the Board's decision was based on her sex. Comparator evidence is relevant to mixed-motive theories even though other steps of the *McDonnell Douglas* burden-shifting framework are not. *See Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019). A "comparator" is someone who is "similarly situated in all material respects" to the plaintiff. *Lewis*, 918 F.3d at 1224. Ordinarily, a valid comparator "will have engaged in the same basic conduct (or misconduct)"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. "[P]recisely what sort of similarity the in 'all material respects' standard entails will have to be worked out on a case-by-case basis, in the context of individual circumstances." *Id.* at 1227.

Fennel first argues that Slater's failure to escalate Bell's prior incidents of alleged harassing and inappropriate misconduct demonstrates that Slater's decision to report the March 8, 2022, incident was motivated in part by Fennel's sex. The record does reveal that Slater gave Bell multiple warnings after Bell repeatedly placed himself in compromised positions with other staff members and students; that

12

Bell engaged in "intimate, inappropriate behavior," including making inappropriate comments to teachers, touching teachers on the arm and shoulder, and having women and girls visit his office for extended lengths of time without an apparent reason; that Slater did not refer Bell for discipline until the March 8, 2022 incident with Fennel; and that by contrast, when Slater was confronted with evidence that Fennel placed herself in a "compromised" position, he immediately reported her misconduct to Goodin and the Board. (Doc. 56-2 at 28–43.)

But Slater's treatment of Bell's prior misconduct is not proper comparator evidence because it involved different kinds of misconduct. Prior to March 8, 2022, Bell was accused of making inappropriate comments to teachers and students, inappropriately touching a student, and spending excessive amounts of time behind closed doors with female teachers and students. But in none of those prior incidents was Bell observed adjusting his clothing after being discovered alone with a colleague behind closed doors. And in none of those circumstances did that misconduct affirmatively impact an ongoing emergency, such as the student fight that Fennel failed to quickly address. And further, when Bell was found alone with Fennel in his office, he was subject to the *same* discipline—termination—as Fennel for the same primary misconduct. Thus, Slater's treatment of Bell actually supports the Board's argument that Fennel's termination was *not* motivated by sex.

Fennel also points to two additional male comparators who were not terminated after committing misconduct. The first is Ken Burdett, who received a two-day suspension after he swiped his hand on a male administrator's buttocks while making reference to a "bromance" and asking the administrator, "Debit or credit?" (Doc. 56-19 at 2–3.) The second is Roman Zeigler, who received no formal discipline after being accused of taking a picture of a female employee from behind and making racially charged and gender-biased comments at school. (Doc. 56-20 at 2–5.) They are not sufficient comparators either, especially because they engaged in

13

differing kinds of misconduct. They were accused of public touching, making inappropriate comments, and taking an inappropriate picture of a colleague. But unlike here, they were not found in close proximity in a compromising position behind closed doors during school hours and during a student emergency. Nor did the alleged comparators engage in more than one instance of related conduct, whereas Fennel and Bell had been previously observed alone, in close proximity, under questionable circumstances. *See Knight v. Baptist Hosp. of Miami, Inc*., 330 F.3d 1313, 1318 (11th Cir. 2003) (considering the number and nature of the acts of misconduct in comparator analysis).

Next, Fennel argues that a reasonable jury could infer sex discrimination from the Board's tolerance of sexual harassment. She points to Goodin's findings that revealed "ten employees/students reported having been sexually harassed and placed in awkward interactions with" Bell, yet he faced no discipline. (Doc. 55 at 35.) But the allegation that the Board tolerated sexual harassment is unsupported by the evidence because, as the Board points out, Goodin and the Board were unaware of the prior allegations made by students and teachers against Bell until after Goodin began her investigation of the March 8, 2022 incident. On this point, Goodin testified that she would have recommended that Bell be disciplined had she been informed of his conduct. Still, even if Goodin previously knew of Bell's misconduct, none of the alleged victims wanted to proceed with an investigation of Bell, thereby hampering the Board's ability to investigate and terminate him.

Lastly, Fennel argues that sex discrimination can be inferred because Slater fabricated a memo after-the-fact to make it appear that Fennel previously was warned in September 2021 not to spend long periods of time alone with Bell. In the memo, Slater wrote that he separately met with Fennel and Bell to direct them to limit their interactions behind closed doors. Fennel, for her part, contested that assertion in her deposition, testifying that she never met with Slater about the

14

September 2021 incident and was never warned to avoid spending time alone with Bell. Fennel argues that this evidences pretext for her termination.

Assuming the falsity of Slater's statement about their September 2021 discussion, it does not sufficiently suggest pretext, if it does at all. A plaintiff may rely on "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in a defendant's alleged reason for an adverse employment action to establish that discrimination was the real reason. *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (per curiam) (citing *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). But here, Fennel does not dispute the *substance* of the reason cited by the Board for her termination—that she was seen alone with Bell in close physical proximity in the teacher's lounge in September 2021, or that Slater was aware of it. And in her deposition, she did not firmly deny the incident either; instead, she testified that she did not recall it.

In sum, Fennel has failed to produce sufficient evidence from which a reasonable jury could conclude that her sex was a motivating factor in the Board's decision to terminate her, especially since Bell—a male—was also terminated for the same incident. Consequently, the Board's summary judgment motion is due to be granted on Fennel's sex discrimination claim.[3]

## B.   Associational Race Discrimination Claim

In Count II, Fennel alleges the Board also terminated her employment because of race. In particular, she argues the Board terminated her because she, a white

---

[3] Fennel expressly disclaims reliance on the *McDonnell Douglas* test used for single-motive theories of discrimination. (Doc. 55 at 22–25.) But even if she had asserted a single-motive theory of discrimination, it would not alter the Court's conclusion that summary judgment is due to be granted in favor of the Board. Fennel failed to provide sufficient circumstantial evidence to allow a jury to infer intentional discrimination under the "lessened standard of causation" applicable to mixed-motive theories, so she necessarily failed to meet the more exacting requirements of *McDonnell Douglas*, including appropriate comparator evidence. *See McCreight*, 117 F.4th at 1333.

15

woman, associated with Bell, a black man. Like her sex discrimination claim, Fennel relies on circumstantial evidence and a mixed-motive theory of discrimination.

To establish an associational race-discrimination claim under Title VII, a plaintiff must prove that her employer (1) took adverse action against her (2) because of her interracial association. *Parr v. Woodmen of the World Life. Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986). In other words, "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race." *Id.* (emphasis in original).

As a preliminary matter, the Board argues that Fennel's claim fails as a matter of law because the Eleventh Circuit has recognized associational claims only in two circumstances: interracial marriages and interracial relationships—and here, Fennel denies the existence of any personal or romantic relationship with Bell. So, according to the Board, the association between Fennel and Bell was not to a degree necessary to support an associational claim under Title VII.

The Board's interpretation is too narrow. Title VII prohibits an employee's termination "because of [her] race." 42 U.S.C. § 2000e-2(a). When an employee complains that she was terminated *because of* her interracial association, it necessarily falls within the statutory language that she was terminated "because of" race—the degree of association is immaterial. *Cf. Bostock v. Clayton County*, 590 U.S. 644, 656–57 (2020) (interpreting the phrase "because of" in Title VII).

Although the Eleventh Circuit has not expressly addressed the issue, other courts have recognized Title VII associational claims premised upon casual social relationships. *See, e.g.*, *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) (stating, in the context of a race discrimination case, that "Title VII protects individuals who, though not members of a [protected] class, are victims of discriminatory animus toward protected third persons with whom the individuals associate" (internal quotation marks omitted)); *Whitney v. Greater N.Y. Corp. of*

16

*Seventh Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975) (recognizing Title VII claim for white employee's discharge because of her social relationship with a black man); *Alford v. Hill Top Rsch. Inc.*, No. 8:24-cv-00657-WFJ, 2024 WL 2317961, at 3 (M.D. Fla. May 22, 2024). Thus, Fennel's claim does not fail merely because she does not allege that she was married to or in a romantic relationship with Bell.

As to the merits, Fennel relies upon much of the same circumstantial evidence that she relies upon for her sex discrimination claim. For additional support, she points to comparator evidence of Slater's failure to discipline Eutsey—a black female—for her relationship with Bell. When Bell was questioned about the September 2021 incident with Fennel, he told Slater, "Ms. Eutsey has rubbed my back sitting in the commons before . . . . She's held my hand in the hallway. No one has ever said anything about that." (Doc. 56-4 at 31.) In essence, Fennel argues that if she were black, she would not have been disciplined for her perceived intimate relationship with Bell.

Like her other comparator evidence, Slater's treatment of Eutsey is insufficiently similar in all material respects to raise an inference of discriminatory intent based on race. For one, Slater did not receive reports about Bell and Eutsey from concerned colleagues or students; rather, Bell informed Slater of his interactions with Eutsey in defense of his relationship with Fennel after-the-fact. Without a witness who was willing to lodge a complaint about Bell, Slater's ability to investigate Bell or any of his conduct was very limited. Moreover, holding hands or rubbing another's back in public view is very different than being discovered behind closed doors in an apparent intimate manner during a student emergency.

Lastly, Fennel argues that Slater moved to terminate her at the same time as Bell to avoid a claim of racism. She argues Slater had incentive to terminate a white employee at the same time as Bell for similar conduct because Bell blamed the

17

earlier sexual harassment allegations on racism. But any inference of racial motivation on the part of Slater amounts to pure speculation. And the timing of their terminations is not suspect given that Fennel and Bell were both involved in the same incident the same day.

Ultimately, Fennel's associational claim fails because she has offered insufficient direct or circumstantial evidence beyond dissimilar comparators and the speculative incentives of Slater to suggest that the Board's decision to terminate her employment was because of race.

## VI. CONCLUSION

For the reasons stated, the Defendant's Motion for Summary Judgment (doc. 47) is due to be **GRANTED**. A separate Final Judgment will be entered.

DONE on this the 6th day of October 2025.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE